O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PAUL J. COX, JR. | ) | NO. EDCV 06-00003-GHK(MAN) |
| | ) | |
| Petitioner, | ) | SECOND AMENDED REPORT AND |
| | ) | |
| v. | ) | RECOMMENDATION OF UNITED STATES |
| | ) | |
| KATHY MENDOZA-POWERS, Warden, | ) | MAGISTRATE JUDGE |
| | ) | |
| Respondent. | ) | |
| | ) | |

This Second Amended Report and Recommendation is submitted to the Honorable George H. King, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California.

## INTRODUCTION

Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on January 3, 2006 ("Petition"). Respondent moved to dismiss the Petition for lack of subject matter jurisdiction on the asserted ground that Petitioner had not obtained authorization from the United States Court of Appeals for the Ninth Circuit to file a second

1   or successive petition.   The Court denied the motion, because

2   Petitioner, in fact, had obtained such authorization from the Ninth

3   Circuit.   The Court appointed the Office of the Federal Public Defender

4   to represent Petitioner.   Respondent thereafter filed an Answer,[1] and

5   Petitioner filed a Reply.

6

7       On January 22, 2010, the Court issued a Report and Recommendation,

8   recommending that the Petition be denied.   On March 2, 2010, Petitioner

9   filed Objections to the Report and Recommendation ("Objections I"),

10  accompanied by additional evidence.   Respondent did not object or

11  otherwise respond to the additional evidence.   On June 4, 2010, the

12  Court issued an Amended Report and Recommendation.   On July 9, 2010,

13  Petitioner filed Objections to the Amended Report and Recommendation

14  ("Objections II").

15

16      Having considered Petitioner's Objections II in the light of the

17  record, the Court now submits this Second Amended Report and

18  Recommendation.

19

20                          **PRIOR PROCEEDINGS**

21

22      On December 20, 1996, a Riverside County Superior Court jury found

23  Petitioner guilty of one count of second degree murder.   (Lodgment No.

24  14, Clerk's Transcript ("CT") 172-73, 218.)   The jury found that

25  Petitioner personally used a firearm in the commission of the offense.

26

27          [1]    On three separate occasions, Respondent has lodged pertinent
    portions of the state record, which the Court refers to, collectively,
28  as "Lodgment."

2

(CT 172, 219.)  The trial court sentenced Petitioner to state prison for a total term of 19 years to life.  (CT 251-52, 270.)

Petitioner appealed.  (Lodgment Nos. 17-19.)  On September 2, 1998, the California Court of Appeal issued an unpublished decision affirming Petitioner's conviction and sentence.  (Lodgment No. 20.)  Petitioner filed a petition for review in the California Supreme Court, which that court summarily denied.  (Petition at 4.)

On November 22, 1999, Petitioner filed a Section 2254 habeas petition for a writ of habeas corpus in this district in the action Cox v. Carey, CV 99-12079-GHK (MAN) ("Prior Petition").  (Lodgment No. 1.) On October 1, 2002, the Court issued a Report and Recommendation recommending the denial of the Prior Petition on its merits.  (Lodgment No. 2.)  On November 20, 2002, District Judge King denied the Prior Petition and dismissed the action with prejudice.  (Lodgment Nos. 3-4.) On May 20, 2003, the Ninth Circuit denied Petitioner's request for a certificate of appealability (Case No. 03-55067).

On November 20, 2003, Petitioner filed a habeas petition in the Riverside County Superior Court, raising the claim presented in this Petition.  (Lodgment No. 6.)  On November 24, 2003, the Riverside County Superior Court denied the petition on the ground that Petitioner failed to allege sufficient facts to establish a prima facie case for his release.  (Lodgment No. 7.)  Petitioner then filed a habeas petition in the California Court of Appeal raising the same claim.  (Lodgment No. 8.)  On January 21, 2004, the California Court of Appeal denied the petition without comment or citation to authority.  (Lodgment No. 9.)

3

1   Petitioner then filed a habeas petition raising the same claim in the
2   California Supreme Court.  (Lodgment No. 12.)  On January 19, 2005, the
3   California Supreme Court denied the petition without comment or citation
4   to authority.  (Lodgment No. 13.)

6       While his California Supreme Court habeas petition was pending,
7   Petitioner filed another habeas petition raising the same claim in the
8   Riverside County Superior Court.  (Lodgment No. 10.)  On July 14, 2004,
9   the Superior Court denied the petition on the ground that the same facts
10  had been alleged in the previous habeas petition, which had been
11  considered and denied.  (Lodgment No. 11.)

13      On November 23, 2005, Petitioner obtained from the Ninth Circuit
14  authorization to file a second or successive habeas petition raising the
15  claim alleged in the instant Petition.  (*See* Ninth Circuit Order dated
16  November 23, 2005, Case No. 05-75522, copy attached to the Petition.)
17  Petitioner then filed this Petition.

19                    **SUMMARY OF THE EVIDENCE AT TRIAL**

21      The Court has reviewed the record in this case, as well as the
22  California Court of Appeal's summary of the evidence in its opinion on
23  direct appeal.  The state appellate court's summary is consistent with
24  the Court's own review of the record.  Thus, the Court has quoted it
25  below to provide an initial factual overview.[2]  Additional relevant

27          [2]    In affirming Petitioner's conviction, the California Court of
28  Appeal discussed the evidence presented at trial in a summary entitled
    "Facts."  (Lodgment No. 20 at 2-7.)  On federal habeas review, "a

                                    4

1   portions of the trial record will be discussed as needed in connection

2   with the Court's analysis of Petitioner's claim.

3

4           [Petitioner] was convicted of murdering Kelvin Redd at

5       a gas station in Moreno Valley.  [Petitioner] admitted the

6       killing but claimed he acted in self-defense.  While many of

7       the facts were not disputed, the prosecution and defense

8       versions of the killing and the events leading up to it

9       differed in significant respects.

10

11          A.   Prosecution Evidence

12

13          On June 3, 1995, at about 8:40 p.m., Redd, Dezon Cox,[3]

14  _____

15  determination of a factual issue made by a State court shall be
    presumed to be correct," unless rebutted by the petitioner by clear and
16  convincing evidence.  28 U.S.C. § 2254(e)(1).  See also Schriro v.
    Landrigan, 550 U.S. 465, 473-74, 127 S. Ct. 1933, 1939-40
17  (2007)("AEDPA also requires federal habeas courts to presume the
    correctness of state courts' factual findings unless applicants rebut
18  this presumption with 'clear and convincing evidence.'")(citing Section
    2254(e)(1)); Pollard v. Galaza, 290 F.3d 1030, 1033, 1035 (9th Cir.
19  2002)(statutory presumption of correctness applies to findings by both
    trial courts and appellate courts); Dubria v. Smith, 224 F.3d 995, 1000
20  (9th Cir. 2000)(en banc).

21          The Section 2254(e)(1) presumption has not been shown to be
22  inapplicable to the state appellate court's description of the evidence
    presented at Petitioner's trial.  Accordingly, in the above summary,
23  the Court has quoted the pertinent portions of the state court's
    decision.  See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir.
24  2009)(relying on and presuming the correctness of the state appellate
    court's summary of the evidence at trial, when such findings had not
25  been shown to be erroneous under Section 2254(e)(1)), cert. denied, 130
    S. Ct. 1086 (2010); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir.
26  2009)(same).

27

28          3   Footnote 1 in original: "Dezon Cox was not related to
    [Petitioner] Paul Cox.  For clarity, we will refer to Dezon Cox as

                                    5

and Deandre Jones stopped for gas at the Fastrip station in Jones' Cadillac.  They were unarmed.  A pickup truck pulled in, with [Petitioner] and Robert Grant in it.  Redd told Cox he recognized [Petitioner] from an incident three days earlier, when a car full of Blood gang members had tried to jump him.  Redd and Cox were members of Crip gangs, which were rivals to the Bloods.  According to police officers, [Petitioner] was a Blood member.

[Petitioner] and Grant got out of the truck.

Redd and Cox got out of the Cadillac.  Redd approached [Petitioner] and asked him, "What is up, man.  Do you remember me?"  [Petitioner] replied, "Yeah, I remember you, Blood."  Redd then said, "Well what is up?  I ain't by myself now.  We can take this from the shoulder [i.e. fight] me and you."

Petitioner said, "Fuck that, I ain't doing no fighting."  [Petitioner] pulled out the gun.  Cox heard three shots and heard Redd yell.  He saw Redd on the ground.  [Petitioner] passed the gun to Grant, and Grant ran away.  [Petitioner] drove away in the truck.

Police officers heard the gunshots and pursued and caught Grant.  Grant said [Petitioner] had shot Redd and told

_____

'Cox' and to Paul Cox as '[Petitioner]'."

the officers where the gun was.  At the gas station, the officers found three .380 caliber shell casings and a .380 caliber semiautomatic handgun containing three hollow point rounds marked "RP" .380.  They found no weapon on Redd.

[Petitioner] was apprehended about four or five hours later, leaving his home with his father.  A piece of plywood and a notebook, both containing Blood gang graffiti, were found in [Petitioner]'s bedroom.  In [Petitioner]'s closet, officers found a box containing seven .380 caliber hollow point rounds, marked "RP" .380.

Redd died of three gunshot wounds.  Two bullets entered his chest and one entered his back.  The wounds were consistent with Redd turning during the shooting.

B.   <u>Defense Evidence</u>

[Petitioner] and his sister testified that a couple of weekends before June 3, 1995, they were stopped at the intersection where the Fastrip station was located when they saw Redd and a companion on the street.  Redd looked at [Petitioner] and said, "What's up, cuz?"[4]  [Petitioner] said, "Man, I don't bang" (i.e. participate in gang activities.)  Redd said to his friend, "Look at that punk

---

[4]   Footnote 2 in original:  "The prosecution's gang expert testified that 'What's up, Cuz?' is a Crip challenge to a Blood, to fight."

motherfucker," and told [Petitioner], "I'll catch your ass later, 'Cuz.'" [Petitioner] construed the statement as a threat.[5]

[Petitioner] and Robert Grant testified that, at about 8:30 p.m. [on] June 3, 1995, they went to the Fastrip for gas in Grant's father's truck with [Petitioner]'s one-year-old son. According to Grant, three men in a Cadillac "mad dogged" (i.e. stared in a hostile manner at) [Petitioner]. One of the men approached [Petitioner]. The man reached and pulled out a gun. [Petitioner] shot him. Grant did not see where [Petitioner] got the gun.

According to [Petitioner], Grant gave him the gun, saying he did not want to take it into the store or leave it in the truck with [Petitioner]'s son. [Petitioner] put the gun in his pocket. As [Petitioner] was giving his son some candy, he was approached from behind by Redd and Cox. Redd said, "What's up, cuz? Do you remember me?" [Petitioner] remembered Redd as the man who had approached him at the intersection a couple of weeks before. [Petitioner] told Redd he had his son with him and did not want any problems. Redd said, "Fuck that, it's going down." He reached for his waist and [Petitioner] saw his gun. Redd looked as if he did not care, "like he was high or something."

_____

[5]     Footnote 3 in original:   "The prosecution's gang expert confirmed that 'I'll catch your ass later, Cuz,' from a Crip to a Blood, is a deadly threat."

[Petitioner] believed Redd was going to shoot him.[6] [Petitioner] reached in his pocket, got the gun, and shot. Cox and Jones were standing over Redd, and [Petitioner] saw "things being passed back and forth." He thought Cox and Jones might be retrieving Redd's gun, so he jumped in the truck and drove away.

Michael Garcia, a friend of [Petitioner]'s, testified he was at the Fastrip station at about 8:30 or 9 p.m. He saw three or four people about to "jump" [Petitioner]. As the others approached, [Petitioner] waved his hand, as if he did not want any problems. One of the people reached for a gun, and [Petitioner] shot him.

[Petitioner]'s mother testified [Petitioner] called her about 8:30 p.m., sobbing and hysterical. [Petitioner] said, "Oh, God, mom, I had to shoot somebody." [Petitioner] also said, "I didn't have a choice, mom." [Petitioner] said he had to go to the police station. Mrs. Cox told [Petitioner] to come home.

[Petitioner] arrived home less than five minutes later.

---

[6]    Footnote 4 in original:  "[Petitioner] asserts Cox told an investigator that 'someone in his car said, "Kill that Blood,"' when they saw [Petitioner] at the Fastrip station.   Actually, the investigator testified that Cox said *Redd* had told him that during the encounter *three days earlier*, someone *in the car of people who confronted Redd* said, 'Kill that Blood.' Cox, however, testified that Redd told him someone in the car full of Bloods said, 'Kill *him*, Blood,' not 'Kill that Blood.' (Italics added.)  'Kill him, Blood' would have made more sense, since Redd was a Crip and not a Blood."

He was shaking and crying, asking God to forgive him, and saying he did not mean to do it and had no choice. [Petitioner]'s sister testified that [Petitioner] was scared, nervous, and upset, and said, "I'm sorry, but I had to protect myself. He was going to hurt me." [Petitioner] said the man he shot was the same man who had challenged him at the intersection several weeks before.[7]

Mrs. Cox decided to take [Petitioner] to the police station. They got in the car but were stopped by the police before they could drive to the station.

Eugene Porter, [Petitioner's] cousin, testified he was a Blood member from about 1985 to 1995. Porter stayed with [Petitioner]'s family at various times before June 3, 1995. In 1993, eight Crips "jumped" Porter, and he was in a coma for two or three days. [Petitioner] testified he knew about the incident.

[Petitioner] and Mrs. Cox testified Porter wrote the gang graffiti on the plywood found in [Petitioner]'s room, although Mrs. Cox confirmed that some of the gang writing in

---

[7]   Footnote 5 in original:  "After [Petitioner]'s mother and sister testified to his statements following the shooting, the court ruled the statements should not have been admitted, because they were made too late after the shooting to qualify as spontaneous declarations under Evidence Code section 1240.  The court said it was going to admonish the jury not to consider the statements.  However, there is no indication that it did so.  Accordingly, we will assume the jury believed it could consider the statements."

the notebook was [Petitioner's].   Mrs. Cox testified she inadvertently left the box of bullets in [Petitioner's] closet when she was putting away laundry.   The bullets had been left on [Petitioner's] father's work bench and belonged to a brother of [Petitioner's] mother.   [Petitioner] testified he did not know the bullets were in his room.

[Petitioner] presented character testimony from four neighbors, who testified he was honest and not violent. [Petitioner's] mother, sister, girlfriend and cousin, Robert Grant, and [Petitioner] himself, testified [Petitioner] was not a gang member.[8]

(Lodgment No. 20 at 2-7.)

## PETITIONER'S CLAIM

Petitioner's right to due process was violated when the state courts refused to grant him a new trial based on newly discovered evidence supporting his defense that he shot the victim in self-defense. (Petition at 6, 6a.)

///

///

///

///

---

[8]   Footnote 6 in original: "In his brief, however, [Petitioner] states he 'was a member of, or associated with, members of a Blood gang known as Treetop Piru.' [Petitioner] also refers to Redd as 'a rival gang member.'"

DISCUSSION

I.    __BACKGROUND__

Petitioner contends that he is entitled to a new trial in state court, because he has discovered new evidence showing that victim Redd was armed.  This new evidence, Petitioner maintains, proves that he shot Redd in self-defense and, thus, was not guilty of the second degree murder charge of which he was convicted.

At trial, Petitioner did not dispute that he shot and killed Redd. Rather, Petitioner contended that the killing did not constitute murder, because he acted in self-defense and in defense of his son.  The parties presented conflicting testimony regarding whether Redd was armed. Prosecution witness Cox testified that Redd was not armed, while defense witnesses Petitioner, Grant, and Garcia testified that Redd had a gun. The prosecution stressed that no gun was found on Redd's body.  The defense argued that Redd's friends, Cox and Jones, removed Redd's gun while the police were chasing Grant.

A.    __Pertinent Trial Testimony__

The following is a summary of pertinent testimony at trial:

1.    __Dezon Cox__

The prosecution called Redd's friend Cox to testify about the circumstances of the shooting.  (Lodgment No. 16, 2 Reporter's

Transcript ("RT") 289.)   Cox testified that he accompanied Jones and Redd to the gas station where the shooting occurred.   (2 RT 290-91.) Jones was Cox's cousin, and Redd was the fiancé of another cousin, Yvette Evans.   (2 RT 290-91.)   Cox testified that Redd recognized Petitioner from a prior encounter and challenged him to a fight.   (2 RT 300, 305-06.)   Petitioner declined to fight and pulled out a gun.   (2 RT 306-07.)   Redd spun around to the left, and Petitioner fired three shots. (2 RT 306, 309.)   Redd fell to the ground, and Petitioner fired two more shots while running towards his truck.   (2 RT 311, 367-68.)

Cox testified that Redd was unarmed.   (2 RT 353-54, 392.)   He denied that he or Jones removed a gun from Redd's body.   (2 RT 392.) Cox admitted, however, that he and Jones were with Redd for approximately five minutes before the police returned, and that this period of time was sufficient to dispose of a gun.[9]   (2 RT 385.)

The defense impeached Cox with evidence of his five prior felony convictions. (2 RT 386-89.)

### 2.   Petitioner

Petitioner testified that he stopped at the gas station to get gas after he, his young son, and Grant were returning from the park in Grant's truck, which Petitioner was driving.   (6 RT 1111-12.)

_____

[9]   Deputies Topping and Yoshimura were driving nearby when they heard shots.   (1 RT 147-48.)   Arriving at the gas station, they saw Grant running away and chased him; Deputy Topping gave chase on foot and Deputy Yoshimura by car.   (1 RT 150-51.)   They returned to the gas station after they caught Grant.   (1 RT 152.)

1  Petitioner went to the store to get candy for his son.  (6 RT 1114.)
2  After he returned, Grant went to the store, but first he gave Petitioner
3  his gun, saying that he did not want to take it to the store or leave
4  it in the truck with Petitioner's son.  (6 RT 1114-15.)  As Petitioner
5  stood by the truck, feeding candy to his son, Redd and Cox approached
6  him from the back. (6 RT 1115-16.)  Redd challenged Petitioner, making
7  threatening statements.  (6 RT 1118-19.)  Redd then stepped back and
8  reached for his waistband, where Petitioner could see a gun.  (6 RT
9  1119.)  Petitioner was afraid that Redd would shoot him and his son.
10  (6 RT 1130.)  Petitioner reached for the gun in his pocket and shot
11  Redd, aiming for "where he was reaching."  (6 RT 1119.)  Petitioner
12  fired three shots.  (6 RT 1119.)  After Petitioner put the gun down,
13  Grant grabbed the gun and ran away.  (6 RT 1124.)  Petitioner saw that
14  Redd's friends, Dezon Cox and Jones, were "passing things back and
15  forth" over Redd's body.  (6 RT 1125.)  Scared, he jumped in the truck
16  and drove off.  (6 RT 1125.)

17

18       Petitioner had no prior felony convictions.  (6 RT 1104.)  The
19  prosecution impeached him with evidence of a prior arrest in a van where
20  a semiautomatic weapon was found, on the theory that he lied to the
21  police when he initially said that he had only been arrested for traffic
22  violations.  (6 RT 1173-74.)  The prosecution also elicited evidence
23  that:  Petitioner initially denied shooting Redd (6 RT 1161-64); he did
24  not admit the shooting until he heard a tape of the police interview
25  with Grant (6 RT 1164-65); he did not tell the police that he had seen
26  Redd with a weapon (6 RT 1230); and he did not tell the police that he
27  had seen Redd's friends standing over his body passing things back and
28  forth (6 RT 1152).

### 3.   Robert Grant

Grant testified that he saw three men in a Cadillac "mad dogging" Petitioner and saw one of the men approach him.  (5 RT 1033-34.)  The man took two steps back and reached for a gun.  (5 RT 1037.)  As the man pulled out a gun, Petitioner shot him.  (5 RT 1037.)  Grant thought he heard four shots.  (5 RT 1038.)  He saw the other two men run towards the victim and reach for his pockets.  (5 RT 1039-40.)  He picked up the gun Petitioner had put down and ran away.  (2 RT 1040.)

The prosecution impeached Grant with evidence of his seven prior felony convictions.   (5 RT 1047.)   The prosecution also elicited testimony that:  Grant did not tell the police that Redd had a gun, although he testified that, when he spoke to the police, he gestured that Redd reached for his waistband[10] (5 RT 1043-44); and Grant never told the police or the district attorney's investigator that he saw Redd's friends searching his pockets (6 RT 1052).

### 4.   Michael Garcia

Garcia was introduced to Petitioner by a mutual acquaintance and afterwards greeted him when he saw him driving by.  (4 RT 801-03.)  At the time of the shooting, Garcia was at the gas station with his friends.  (4 RT 787-88, 801-04.)  He saw three or four men about to "jump" Petitioner, who was standing by a truck.  (4 RT 790-91.)  One of

---

[10]    Grant testified that he thought the police understood that his hand gesture and his repeated statements that Redd "went like this" referred to a gun.  (5 RT 1043-44; *see also* 6 RT 1084.)

the men took a step back, pulled up his shirt, and reached for a gun, turning to the side as he did so.  (4 RT 792-93, 4 RT 827.)  Petitioner shot him.  (4 RT 793, 826-828.)  Garcia heard three or four shots.  (4 RT 805.)  He did not see what happened after the shooting, because he immediately left the gas station.  (4 RT 828-29.)

The prosecution impeached Garcia with evidence of his four prior felony convictions.  (4 RT 795-96.)

### 5.   **Physical Evidence**

Forensic pathologist Dr. Choi testified that Redd sustained three gunshot wounds.  (3 RT 408.)  Two were in the right chest, and one was in the middle of Redd's back.  (3 RT 408-09.)  Any one of the gunshot wounds was sufficient to kill Redd.  (3 RT 414.)  Dr. Choi testified that the location of the shots, which appeared to be going from right to left and slightly upward, was consistent with Redd turning left and away from the shooter as he fell.  (3 RT 416, 418-19.)

Police found three casings on the scene.  (1 RT 184; 3 RT 447-50.)

### B.   **New Evidence**

The new evidence consists of two declarations by Robert Hannah. Hannah's original declaration, dated September 2, 2003, was submitted to the state courts when Petitioner exhausted his claim.  (Declaration of Robert Han[n]ah, dated September 2, 2003, appended to the Petition ("Hannah Decl. I").)  Petitioner submitted, along with his Objections

16

1    I, a new declaration by Hannah that expands on the statements in his

2    original declaration. (Declaration of Robert Han[n]ah, dated September

3    25, 2010, appended to Objections I as Exhibit A ("Hannah Decl. II").)

4

5        The Supreme Court recently held that habeas "review under

6    § 2254(d)(1) is limited to the record that was before the state court

7    that adjudicated the claim on the merits." Cullen v. Pinholster, __

8    U.S. __, 131 S. Ct. 1388, 1398 (2011).  The Supreme Court reasoned that

9    the "backward-looking language" of Section 2254(d)(1) "requires an

10   examination of the state-court decision at the time it was made," and

11   thus, the record under review must be "limited to the record in

12   existence at that same time *i.e.*, the record before the state court."

13   *Id.*  Accordingly, under Pinholster, the record in this case may not be

14   expanded to include the second Hannah declaration for purposes of review

15   under 28 U.S.C. § 2254(d)(1).  The Supreme Court's Pinholster decision,

16   however, does not preclude the Court from considering Hannah's second

17   declaration in connection with its determination regarding whether the

18   Petition satisfies the requirements of 28 U.S.C. § 2244(b) for a second

19   or successive petition.  Because the Court will consider Hannah's second

20   declaration for purposes of its Section 2244(b) determination, the

21   contents of both Hannah declarations are summarized below.

22

23       In his original declaration, Hannah declares that, on or about June

24   3, 1995, he drove his Chevrolet Malibu into the Fastrip where the

25   incident occurred. (Hannah Decl. I at 1.)  He saw Redd get out of a car

26   and approach Petitioner. (*Id.*)  Hannah knew who Redd was and had seen

27   him before. (*Id.*)  At that time, Hannah did not know Petitioner. (*Id.*)

28

Initially, Redd and Petitioner appeared to be having a normal conversation, but then Hannah saw Redd circle Petitioner and saw Redd reach into his waistband. (Hannah Decl. I at 1.) Hannah heard three shots and saw Redd fall to the ground. (*Id.*) Two individuals jumped out of Redd's car; as they approached Redd, Petitioner jumped into a truck and drove away. (*Id.*) Hannah saw the two individuals remove a gun from the waistband of Redd's pants and remove other items from Redd's pocket. (*Id.*) Hannah left before the police arrived on the scene. (*Id.*)

Hannah recognized Petitioner when he encountered him at Ironwood State Prison. (Hannah Decl. I at 1.) Hannah told Petitioner that he had been present during the shooting and described what he had seen. (*Id.*) Hannah declares that he would testify to these facts if called to do so.[11] (*Id.* at 1-2.)

In his second declaration, Hannah furnishes additional details. He declares that he was sitting in his car, eating snacks, at the time of the incident. (Hannah Decl. II ¶ 2.) He had backed his car into a parking space at the edge of the parking lot and was facing the gas pumps. (*Id.* at ¶ 1.) While sitting in his car, he saw Redd get out of a vehicle and walk towards Petitioner. (*Id.* at ¶ 2.) Hannah knew Redd through mutual friends, and Redd had once asked him where he could get some marijuana, but at that time Hannah did not know Petitioner. (*Id.*)

---

[11] Hannah's original declaration is notarized, but it is not made under penalty of perjury. Hannah's second declaration rectifies this omission.

Hannah declares that, at first, the conversation between Redd and Petitioner appeared normal, but then their gestures and movements appeared "more aggressive." (Hannah Decl. II ¶ 2.) Hannah saw Redd reach into the waist of his pants. (*Id.* at ¶ 3.) Hannah saw that Redd had a gun there, which he tried to tug out, but the gun appeared to be caught in his waistband. (*Id.*) At that point, Hannah heard approximately three shots and Redd fell to the ground. (*Id.*)

Hannah's second declaration adds little to his previous description of how he saw two men from Redd's vehicle remove the gun from the waistband of Redd's pants and items from Redd's pockets. (Hannah Decl. II ¶ 4; Hannah Decl. I at 1.) He adds only that the individuals kept the gun but left some of the items from Redd's pockets on top of a gas pump. (Hannah Decl. II ¶ 4.) However, while in his original declaration Hannah states only that he left before the police arrived, in his second declaration he describes his actions after the shooting in greater detail. (Hannah Decl. II ¶¶ 4, 5; Hannah Decl. I at 1.) Hannah declares that a police car drove through the lot with its lights and sirens on, but it did not stop. (Hannah Decl. II ¶ 4.) The two men who had removed Redd's gun got into their car and drove away. (*Id.*) Hannah pulled out of the Fastrip lot and parked his car in the parking lot of the Jack in the Box restaurant across the street. (*Id.*) While at the Jack in the Box, he saw the two men return to the Fastrip lot. (*Id.* at ¶ 5.) He estimates that they were gone about ten minutes. (*Id.*) Police officers then arrived, and Hannah saw them talking to the two men. (*Id.*)

1    **II.   THE PETITION SHOULD BE DISMISSED FOR FAILURE TO MEET THE**

2    **REQUIREMENTS FOR FILING A SECOND OR SUCCESSIVE PETITION.**

3

4        **A.   Applicable Law**

5

6       AEDPA "greatly restricts the power of federal courts to award

7    relief to state prisoners who file second or successive habeas corpus

8    applications." <u>Tyler v. Cain</u>, 533 U.S. 656, 661, 121 S. Ct. 2478,

9    2481-82 (2001).  Congress established a "gatekeeping" mechanism for the

10   consideration of second or successive habeas corpus petitions in the

11   federal courts.  <u>Stewart v. Martinez-Villareal</u>, 523 U.S. 647, 641, 118

12   S. Ct. 1618, 1620 (1998); <u>Felker v. Turpin</u>, 518 U.S. 651, 657, 116 S.

13   Ct. 2333, 2339 (1996); 28 U.S.C. § 2244(b)(3).  Under this procedure,

14   "[a]n individual seeking to file a 'second or successive' application

15   must move in the appropriate court of appeals for an order directing the

16   district court to consider his application." <u>Stewart</u>, 523 U.S. at 641,

17   118 S. Ct. at 1620.  The circuit court "may authorize the filing of a

18   second or successive application only if it determines that the

19   application makes a prima facie showing that the application satisfies

20   the requirements of" Section 2244(b).  28 U.S.C. § 2244(b)(3)(C); *see*

21   *also* <u>Morales v. Ornoski</u>, 439 F.3d 529, 531 (9th Cir. 2006).

22

23       Specifically, Section 2244(b)(2) requires the dismissal of a second

24   or successive petition unless:

25

26      (A) the applicant shows that the claim relies on a new rule

27        of constitutional law, made retroactive to cases on

28        collateral review by the Supreme Court, that was previously

1    unavailable; or

2

3       (B)(i) the factual predicate for the claim could not have

4       been  discovered  previously  through  the  exercise  of  due

5       diligence; and

6

7          (ii) the facts underlying the claim, if proven and viewed

8       in light of the evidence as a whole, would be sufficient to

9       establish by clear and convincing evidence that, but for

10      constitutional  error,  no  reasonable  factfinder  would  have

11      found the applicant guilty of the underlying offense.

12

13   28 U.S.C. § 2244(b)(2)(A) & (B).

14

15       If  the  circuit  court  grants  permission  to  file  a  second  or

16   successive petition, the petitioner then has the burden of actually

17   showing that each habeas claim satisfies the requirements of Section

18   2244.  *See* <u>Tyler</u>, 533 U.S. at 661 n.3., 121 S. Ct. at 2481 n.3 (the

19   court of appeals may authorize the filing of a second or successive

20   petition upon a prima facie showing, "[b]ut to survive dismissal in

21   district court, the applicant must actually 'sho[w]' that the claim

22   satisfies  the  standard").   Section  2244(b)(4)  provides  that:   "A

23   district court shall dismiss any claim presented in a second or

24   successive application that the court of appeals has authorized to be

25   filed  unless  the  applicant  shows  that  the  claim  satisfies  the

26   requirements of this section."  "[U]nder section 2244(b)(4), a district

27   court must conduct a thorough review of all allegations and evidence

28   presented by the prisoner to determine whether the [petition] meets the

statutory requirements for the filing of a second or successive [petition]." United States v. Villa-Gonzalez, 208 F.3d 1160, 1165 (9th Cir. 2000); see also Goldblum v. Klem, 510 F.3d 204, 219-20 (3d Cir. 2007). The petitioner "must make more than another prima facie showing." Villa-Gonzalez, 208 F.3d at 1164. When the record conclusively shows that the petition does not meet the requirements for filing a second or successive petition, summary denial of the petition is proper. Id. at 1165.

**B.    Analysis**

Here, Petitioner does not rely on a new rule of constitutional law. Therefore, the Court must consider whether Petitioner meets the requirements for a second or successive petition set forth in Section 2244(b)(2)(B). The Court will accept, for purposes of its analysis, that Petitioner has satisfied the due diligence prong. 28 U.S.C. § 2244(b)(2)(B)(i). Petitioner, however, fails to satisfy the requirement of Section 2244(b)(2)(B)(ii), because the newly discovered evidence is not "sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

Petitioner contends that the newly discovered evidence set forth in the Hannah declarations shows that Petitioner shot the victim in self-defense, and thus, he is not guilty of murder. If Petitioner's claim alleges "constitutional error" within the meaning of the statute at all, it can only be based upon his asserted "actual innocence" of the

offense of which he was convicted.[12]   As discussed below, it is an open question whether a freestanding actual innocence claim is cognizable under federal habeas law.   *See* District Attorney's Office v. Osborne, ___ U.S. ___, 129 S. Ct. 2308, 2321 (2009); House v. Bell, 547 U.S. 518, 554-55, 126 S. Ct. 2064, 2087 (2006); Herrera v. Collins, 506 U.S. 390, 113 S. Ct. 853 (1993).   Furthermore, as also discussed below, assuming that "actual innocence" provides a basis for federal habeas relief and constitutes "constitutional error" within the meaning of Section 2244(b)(2)(B),[13]   Petitioner's factual showing is insufficient to meet

---

[12]   Some of Petitioner's statements in his Petition suggest that he is not arguing that the newly-discovered evidence shows that the killing constituted justifiable homicide, but only that it supports a conviction for the lesser offense of manslaughter.   (*See* Petition at 6a.)   If that is so, it is doubtful that Petitioner has alleged a constitutional claim at all.   However, based on Petitioner's other statements in the Petition, Traverse, and Objections I and II, the Court liberally construes his claim as alleging that the new evidence shows that the killing was justifiable homicide, because he killed Redd in self-defense.

[13]   In In re Davis, 565 F.3d 810 (11th Cir. 2009), the Eleventh Circuit noted that the statutory standard of Section 2244(b)(2) -- that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense" -- does not readily accommodate a freestanding actual innocence claim.   *Id.* at 823. The Eleventh Circuit stated that when "actual innocence" is the "constitutional error," the statutory standard would have to be read as "but for *the fact that the applicant was actually innocent*, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.* (*emphasis in original*).   The Eleventh Circuit declared that such a reading makes no sense and renders the "but for constitutional error" language superfluous, requiring a petitioner to show only clear and convincing evidence of actual innocence to satisfy the statute.   *Id.*   The Eleventh Circuit nevertheless applied this reading of the statute and found the evidence proffered by the petitioner, Davis, to be insufficient to satisfy Section 2244(b)(2)(B)'s standard.   *Id.* at 824.

Davis then filed an original habeas petition in the Supreme Court, which transferred the petition to the Southern District of Georgia for an evidentiary hearing.   *See* In re Davis, 130 S. Ct. 1

the statutory standard.   *See* <u>Morales</u>, 439 F.3d 533-34 (stating that a second or successive habeas petition based on factual innocence must fail unless the federal habeas court is itself convinced that the new facts unquestionably establish the petitioner's innocence, and denying authorization to file petition when new facts were insufficient to make requisite showing of innocence).

     In essence, Hannah's declarations set forth additional evidence supporting the defense presented by Petitioner at trial.   Petitioner testified that he shot Redd after Redd reached for a gun.  (6 RT 1119.) Hannah's statement in his declarations that he saw Redd reach for a gun, which was stuck in his waistband, corroborates Petitioner's testimony on this point.   However, Petitioner's trial testimony was already corroborated by eyewitnesses Grant and Garcia, both of whom testified that they saw Redd reaching for a gun.   (4 RT 792-93; 5 RT 1037.) Garcia testified that he saw Redd pull up his shirt, reach for a gun and grab it, and that Redd "didn't pull [the gun] all the way out but up." (4 RT 793.)   Grant testified that Redd stepped back two steps and "reached in his side" for a gun.   (5 RT 1037.)   Thus, Hannah's statements that he saw Redd reach for a gun are duplicative of testimony given at trial by three people.   Although Hannah is the only one who explains that Redd was unable to get his gun out, because it was stuck in his waistband, this explanation does little, if anything, to strengthen Petitioner's self-defense theory.

_____

(2009).  The district court subsequently determined that the Supreme Court had implicitly decided that the statutory "second or successive" bar did not apply to a petition originally filed in the Supreme Court, even after its transfer to the district court.  <u>In re Davis</u>, 2009 WL 2750976, at *1 n.3 (S.D. Ga., Aug. 26, 2009).

Petitioner argues that the jury would have afforded Hannah's corroboration greater weight than that of Grant and Garcia, because Hannah did not know Petitioner at the time of the incident and, thus, would have been a neutral, independent witness. (Reply at 8; Objections I at 2-3.) However, the difference between Hannah and the other witnesses in this respect is not as great as Petitioner suggests. Although Grant and Petitioner were friends, Garcia's acquaintance with Petitioner was very slight. In any event, by the time Hannah signed his declarations, he and Petitioner had become acquainted in prison and were no longer strangers.

Petitioner points out that Hannah declares that he actually saw Jones and Dezon Cox remove Redd's gun after the shooting. (Reply at 8; Hannah Decl. I at 1.) There was no comparable testimony at trial: Grant testified only that he saw Jones and Cox reaching for Redd's pockets (5 RT 1039-40); Petitioner testified that he saw them passing "things" from Redd's body (6 RT 1125); and Garcia had no opportunity to see anything, because he left immediately after the shooting (4 RT 828-29). Thus, this portion of Hannah's proffered testimony is not cumulative.

In his second, expanded declaration, Hannah also provides additional detail showing that Jones and Dezon Cox had time to dispose of Redd's gun before returning to the scene. (Hannah Decl. II ¶ 4.) However, Petitioner's trial counsel elicited testimony from Cox that he and Jones had the time and opportunity to remove Redd's gun, and counsel strenuously argued to the jury that the reason no gun was found on Redd was that Cox and Jones had removed it. (2 RT 385-86; 7 RT 1360-62.)

1   Although Hannah's testimony that he actually saw Redd's friends
2   remove the gun would have buttressed counsel's argument, the jury still
3   would have to weigh it against Petitioner's failure to tell the police
4   -- when he finally confessed to the shooting after 15 denials that he
5   had shot Redd and only after being confronted with Grant's taped
6   statement that Petitioner was the shooter -- that Redd had a gun.  The
7   transcript of the interview shows that Petitioner ultimately told the
8   police that he shot Redd because he was scared.  Redd and his friends
9   were walking towards Petitioner and were asking, "What's up?";
10  Petitioner's young son was with him; Petitioner remembered that recently
11  a relative had "got jumped"; and Petitioner thought that he was going
12  to be "jump[ed]" by Redd and his friends.  (Lodgment No. 15 at 18-19.)
13  If, as Petitioner contends, he shot Redd out of fear that Redd would
14  shoot him or his son, it is inexplicable that he would not mention in
15  his police interview that Redd had a gun.[14]   Towards the end of the
16  interview, one of the detectives asked, "Can you think of anything
17  else?" and Petitioner *still* did not mention the gun, saying instead, "I
18  told you all the truth."  (*Id.* at 21.)   Petitioner could not explain
19  this glaring omission at trial; all he could say was that until he saw

20  _____

21       [14]   Petitioner was questioned extensively at trial about his
    statements to the police, but the jury never heard the taped interview
22  or saw the 21-page transcript, in which Petitioner confesses, at pages
    18 to 21, that he shot Redd.  Petitioner's confession, in which Redd's
23  alleged possession of a gun is never mentioned, is prefaced by
    Petitioner's question, "So, I be gone for a long time, huh?"  (Lodg.
24  No. 15 at 18.)   The prosecutor elected not to play the tape, and the
    trial court refused to allow Petitioner's counsel to do so.  (6 RT
25  1203.)   The trial court allowed the tape and transcript to be marked as
    a defense exhibit so that they would be part of the record.  (6 RT
26  1203-04; CT 220.)   In determining whether a habeas petitioner has made
    a sufficient showing of actual innocence, a court reviews all the
27  evidence in the record, including excluded evidence.  *See* Schlup v.
    Delo, 513 U.S. 298, 327-28, 115 S. Ct. 851, 867 (1995).
28

the interview transcript, he thought he *had* mentioned the gun.   (6 RT 1235.)

Moreover, a reasonable jury might have convicted Petitioner of second degree murder, even if it found that Redd was armed.   First, according to Hannah's second declaration, Redd was unable to draw his gun, while the evidence showed that Petitioner fired three, and possibly as many as five, shots at Redd.   Each of the three bullets that hit Redd was sufficient to kill him.   (3 RT 414.)   The forensic pathologist testified that the location of the bullets -- two in Redd's right chest and one in his back -- was consistent with Redd turning away from Petitioner as he was shot.   (3 RT 416.)

Thus, while Hannah's proffered testimony may have strengthened Petitioner's argument that he acted in self-defense, it does not demonstrate, clearly and convincingly, that no reasonable jury would have found Petitioner guilty of murder.   *See* 28 U.S.C. § 2244(b)(2)(B)(ii); *see also* <u>Villa-Gonzalez</u>, 208 F.3d at 1165 (affirming district court's denial of leave to file second 28 U.S.C. § 2255 motion when "the record conclusively show[ed] that a reasonable factfinder could have found that [petitioner] was, at a minimum, subject to aider and abettor liability").   To the contrary, Petitioner's inexplicable failure to tell the police that Redd had a gun when Petitioner confessed to the shooting could well have dissuaded a reasonable jury from concluding that Petitioner shot Redd because he feared that Redd would shoot him.

Petitioner contends that the Court should not make this

27

determination without holding an evidentiary hearing. (Reply at 9; Objections I at 5-7; Objections II at 6-7.) He argues that, by granting him leave to file a second or successive habeas petition, the Ninth Circuit implicitly found that he has met the requirements for an evidentiary hearing. (Reply at 9-10; Objections I at 6-7.) Such an argument was thoroughly discussed and squarely rejected by the Third Circuit in Goldblum, in which the petitioner also argued that a circuit court's determination that he had made a sufficient "prima facie showing" under Section 2244(b)(2) entitled him to an evidentiary hearing before the district court made its determination under Section 2244(b)(4). Goldblum, 510 F.3d at 218. The Third Circuit declared: "[N]otwithstanding a district court's obligation to make an independent gatekeeping inquiry, a district court does not face a requirement that it always conduct an evidentiary hearing in undertaking this more thorough review. Rather, the decision of whether or not to hold an evidentiary hearing is within the district court's discretion." *Id.* (citing Landrigan, 550 U.S. at 473, 127 S. Ct. at 1940).

    Similarly, the Ninth Circuit, in Villa-Gonzales, held that summary denial of a second or successive habeas petition is proper when the petition and the records conclusively show that the petition does not meet the second or successive petition requirements. Villa-Gonzalez, 208 F.3d at 1165. It is only "[i]f the existing record does not conclusively resolve the issue" that the district court "should order a response from the government and hold an evidentiary hearing."[15] *Id.*

────────────

[15]    In his Objections I, Petitioner argues that the Court should not review the same evidence that was submitted to the Ninth Circuit and reach a different conclusion. (Objections I at 6.) This argument

1    Here, the record conclusively shows that Petitioner does not meet

2    the requirements for a second or successive petition.  Petitioner does

3    not contend that he has new evidence of innocence other than that set

4    forth in Hannah's two declarations.  Thus, there would be no purpose for

5    an evidentiary hearing except to determine Hannah's credibility.  This

6    would be a futile exercise, because the Court has already determined

7    that, accepting the contents of Hannah's declarations as true, any such

8    testimony by Hannah does not show, clearly and convincingly, that a

9    reasonable jury would not have convicted Petitioner of murder.  *Contrast*

10   Earp v. Ornoski, 431 F.3d 1158, 1170 (9th Cir. 2005)(evidentiary hearing

11   was necessary to make credibility determination upon which rejection of

12   petitioner's claim depended).

13

14   Accordingly, Petitioner has failed to satisfy Section 2244(b)(2)(B)

15   and to meet the requirements for a second or successive petition.  Under

16   Section 2244(b)2), the Petition, therefore, must be dismissed.

17

18

19   _____

20   is without merit.  *See* Bradford v. Sisto, 376 Fed. Appx. 715, 716, 376
     Fed. Appx. 715, 716 (9th Cir., Apr. 16, 2010), *cert. denied*, 131 S. Ct.
21   1484 (2011)(the fact that the Ninth Circuit authorized successive
     petition "did not preclude the district court from determining that
22   Bradford had not met the requirements for considering a successive
     petition")(citing Villa-Gonzalez, 208 F.3d at 1164-65); *see also* Jordan
23   v. Secretary, Dept. of Corrections, 485 F.3d 1351, 1357-58 (11th Cir.
     2007)(observing that Section 2244(b) "puts on the district court the
24   duty to make the initial decision about whether the petitioner meets
     the § 2244(b) requirements -- not whether he has made out a prima facie
25   case for meeting them, but whether he actually meets them," and that
     "[g]iven these circumstances, it would make no sense for the district
26   court to treat our prima facie decision as something more than it is or
     to mine our order for factual ore to be assayed.  The district court is
27   to decide the § 2244(b)(1) & (2) issues fresh, or in the legal
     vernacular, de novo").

28

III. **ALTERNATIVELY, THE PETITION SHOULD BE DENIED ON THE MERITS.**

Even if the Court could find that the requirements of Section 2244(b)(2)(B) were satisfied here, Petitioner's actual innocence claim should be denied on the merits.

A.    **Standard of Review**

Under AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d); *see also* Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 784 (2011)("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2).").

Clearly established Federal law, for purposes of Section 2254(d)(1) review, means Supreme Court holdings in existence at the time of the state court decision in issue. Pinholster, 131 S. Ct. at 1399; Richter, 131 S. Ct. at 785; Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172 (2003).  Under Section 2254(d)(1), "[w]hat matters are the holdings of the Supreme Court, not the holdings of lower federal

courts." Plumlee v. Masto, 512 F.3d 1204, 1210 (9th Cir. 2008)(*en banc*); *see also* Lambert v. Blodgett, 393 F.3d 943, 974 (9th Cir. 2004)(Section 2254(d)(1) "plainly restricts the source of clearly established law to the Supreme Court's jurisprudence").

Under Section 2254(d)(1)'s first prong, a state court decision is "contrary to" federal law if the state court applies a rule that contradicts the relevant Supreme Court holdings or reaches a different conclusion than that reached by the high court on materially indistinguishable facts. Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003). This includes "use of the wrong legal rule or framework." Frantz v. Hazey, 533 F.3d 724, 734 (9th Cir. 2008)(*en banc*).

Section 2254(d)(1)'s second, "unreasonable application" prong constitutes an objective standard that is not satisfied merely by finding that a state court erred in applying the clearly established federal law. Richter, 131 S. Ct. at 785; Andrade, 538 U.S. at 75, 123 S. Ct. at 1174. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Landrigan, 550 U.S. at 473, 127 S. Ct. at 1939. The standard requires a petitioner to prove that the state decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87; *see also* Renico v. Lett, ___ U.S. ___, 130 S. Ct. 1855, 1866 (2010)(concluding that "whether or not" the state court's decision was "*correct*," habeas relief was not available under

Section 2254(d)(1), because the state court's decision "was clearly *not unreasonable*")(emphasis in original). "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief is precluded. Richter, 131 S. Ct. at 786 (citation omitted).

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,'. . . and 'demands that state-court decisions be given the benefit of the doubt.'" Renico, 130 S. Ct. at 1862 (citations omitted). The standard is "'difficult to meet,'" and a "petitioner carries the burden of proof." Pinholster, 131 S. Ct. at 1398 (citation omitted).

Here, the state courts denied Petitioner's claim on the merits but did not issue a reasoned decision explaining the bases for the denial. A state court's silent denial of a federal claim constitutes a denial "on the merits" for purposes of federal habeas review, and the AEDPA deferential standard of review applies. Richter, 131 S. Ct. at 784-85. Nevertheless, when no state court articulates a reason for the denial of a federal claim, "a review of the record is the only means of deciding whether the state court's decision was objectively unreasonable." Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002). Thus, this Court must independently review the record to determine whether the state courts' denial of Petitioner's claim was contrary to, or constituted an unreasonable application of, clearly established federal law. *See* Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir. 2000). Ultimately, however, Petitioner bears the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 131

1   S. Ct. at 784.

2

3       **B.   <u>Analysis</u>**

4

5       "Newly discovered evidence is a ground for federal habeas corpus

6   relief only when it bears on the constitutionality of an appellant's

7   conviction and would probably produce an acquittal." <u>Spivey v. Rocha</u>,

8   194 F.3d 971, 979 (9th Cir. 1999); *see also* <u>Swan v. Peterson</u>, 6 F.3d

9   1373, 1384 (9th Cir. 1993); <u>Gordon v. Duran</u>, 895 F.2d 610, 614-15 (9th

10  Cir. 1990)("[T]he mere existence of newly discovered evidence relevant

11  to the guilt of a state prisoner is not a ground for federal habeas

12  relief."). Here, Petitioner does not contend that the newly discovered

13  evidence bears on any constitutional error at his trial; indeed, he does

14  not assert that constitutional error occurred at trial. Rather, he

15  contends that the new evidence shows that he was not guilty of murder,

16  because he killed Redd in self-defense. (Petition at 6a.) Thus,

17  Petitioner is seeking habeas relief based purely on his asserted actual

18  innocence.

19

20      In <u>Herrera</u>, the Supreme Court declared: "Claims of actual

21  innocence based on newly discovered evidence have never been held to

22  state a ground for federal habeas relief absent an independent

23  constitutional violation occurring in the underlying state criminal

24  proceeding." 506 U.S. at 400, 113 S. Ct. at 860. However, the Supreme

25  Court went on to assume, without deciding, that at least in a capital

26  case, a freestanding actual innocence claim might warrant federal habeas

27  relief, but only upon an "extraordinarily high" and "truly persuasive"

28  threshold showing. *Id*. at 417, 113 S. Ct. at 869. The Supreme Court

found it unnecessary to resolve the issue, because the petitioner had not met that standard. *Id.* Thirteen years later, in House, the Supreme Court expressly declined to resolve the issue left unresolved in Herrera, stating only that the petitioner had not satisfied the "extraordinarily high" burden for a "hypothetical freestanding innocence claim." 547 U.S. at 554-55, 126 S. Ct. at 2087. Most recently, in Osborne, the Supreme Court declared that the existence of a federal right "to be released upon proof of 'actual innocence'" was "an open question," but once again found it unnecessary to resolve the issue, noting only "the difficult questions such a right would pose and the high standard any claimant would have to meet."[16] 129 S. Ct. at 2321.

The Ninth Circuit has assumed that freestanding actual innocence claims are cognizable in both capital and non-capital cases, but it has held that the petitioner must go beyond demonstrating doubt about his guilt and must affirmatively prove that he is probably innocent. *See* Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997)(*en banc*); Jackson

_____

[16]   Petitioner argues that in In re Davis, *supra*, the Supreme Court determined, "in action if not in words," that habeas relief can be granted on the basis of actual innocence. (Objections II at 8-9.) In In re Davis, the Supreme Court transferred a habeas petition filed in the Supreme Court to the district court for an evidentiary hearing to determine whether newly discovered evidence clearly established the petitioner's innocence. *Id.* It is unnecessary to address Petitioner's argument that, after In re Davis, actual innocence can constitute a basis for federal habeas relief under AEDPA. Even assuming the Supreme Court's 2009 order in In re Davis bears on what currently constitutes the clearly established federal law regarding freestanding actual innocence claims, it has no bearing on what constituted the clearly established law in 2005, when the California Supreme Court denied Petitioner's actual innocence claim. *See* Pinholster, 131 S. Ct. at 1399 (under Section 2254(d)(1), "[s]tate-court decisions are measured against this Court's precedents as of 'the time the state court renders its decision'")(citation omitted).

1    v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000).   The petitioner's

2    burden in such a case is "extraordinarily high" and requires a showing

3    that is "truly persuasive." Carriger, 132 F.3d at 476 (quoting Herrera,

4    506 U.S. at 417, 113 S. Ct. at 869).   Requiring affirmative proof of

5    innocence is appropriate, because when a petitioner makes a freestanding

6    claim of innocence, he is claiming that he is entitled to relief despite

7    a constitutionally valid conviction.   Carriger, 132 F.3d at 477.

8

9       Applying these principles, Petitioner's claim fails for two

10   reasons, each of which separately warrants denial of habeas relief.

11   First, because the Supreme Court has never squarely held that an "actual

12   innocence" claim is a cognizable federal claim and has characterized the

13   issue as an "open question," the state court's decision denying

14   Petitioner's claim cannot be contrary to, or an unreasonable application

15   of, clearly established federal law, as is required by Section

16   2254(d)(1). See Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 654

17   (2006)(when holdings of the Supreme Court regarding the issue presented

18   on habeas review are lacking, "it cannot be said that the state court

19   'unreasonabl[y] appli[ed] clearly established Federal law'"); see also

20   Knowles v. Mirzayance, ___ U.S. ___, 129 S. Ct. 1411, 1419 (2009)(noting

21   that, under Supreme Court precedent, it is not an unreasonable

22   application of clearly established federal law "for a state court to

23   decline to apply a specific legal rule that has not been squarely

24   established by" the Supreme Court); Wright v. Van Patten, 552 U.S. 120,

25   126, 128 S. Ct. 743, 747 (2008)("Because our cases give no clear answer

26   to the question presented, let alone one in [petitioner]'s favor, it

27   cannot be said that the state court unreasonabl[y] appli[ed] clearly

28   established Federal law.   Under the explicit terms of § 2254(d)(1),

therefore, relief is unauthorized.")(*internal citations and quotation marks omitted*); <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1097-98 (9th Cir. 2009)("[c]ircuit precedent may not serve to create established federal law on an issue the Supreme Court has not yet addressed," and "[w]hen there is no clearly established federal law on an issue, a state court cannot be said to have unreasonably applied the law as to that issue"); <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866 (9th Cir. 2006)(when the Supreme Court expressly concluded that the issue raised by a habeas claim was an "open question," the state court's resolution of the claim could not be an unreasonable application of clearly established Supreme Court law). Given the Supreme Court's express acknowledgment, several years after the state court decision in issue, that it remains an "open question" whether federal habeas relief is available even upon proof of actual innocence (<u>Osborne</u>, 129 S. Ct. at 2321), Section 2254(d)(1) does not permit this Court to grant Petitioner federal habeas relief based upon his claim.

Second, even if, *arguendo*, a non-capital habeas petitioner can raise a freestanding actual innocence claim, Petitioner's evidentiary showing falls far short of the demanding standards set forth in <u>Herrera</u>, <u>House</u>, and <u>Carriger</u>. As discussed previously, the Court may consider Hannah's original declaration, because it was before the state courts when they rejected Petitioner's actual innocence claim, unlike Hannah's second declaration.[17]  *See* <u>Pinholster</u>, 131 S. Ct. at 1398.

---

[17]  Even if the Court considered Hannah's second declaration, it is obvious from the foregoing Section 2244(b)(2) analysis that the result would be the same.

1    The proffered newly discovered evidence set forth in Hannah's first
2    declaration is largely cumulative of evidence presented at trial.
3    Hannah, an eyewitness and now fellow inmate, declares that he saw Redd
4    reach towards his waist and, after the shooting, saw Redd's friends
5    remove a gun from Redd's waistband.  At trial, Petitioner and two other
6    witnesses testified that Redd had a gun and reached for it.  Although
7    no other witness claimed to have seen Redd's friends remove the gun
8    after the shooting, Petitioner's counsel was able to marshal
9    considerable circumstantial evidence in support of his argument that
10   they could have done so.

11

12   In addition, the newly discovered evidence -- that another witness
13   claims that Redd had a gun -- must be evaluated in the context of
14   Petitioner's failure to tell the police that Redd had a gun when
15   Petitioner confessed to shooting Redd.  The Court has reviewed the
16   transcript of Petitioner's police interview and finds the omission
17   striking.  Petitioner initially denied shooting the victim.  (Lodgment
18   No. 15 at 7-15.)  Eventually, after asking about the length of his
19   likely sentence, he said that he "got scared," explaining, "[I t]hought
20   they was gonna jump me."  (*Id.* at 18.)  Petitioner told the police that
21   the victim and his friends were coming towards him, saying, "What's up?"
22   and he got scared and shot the victim.  (*Id.* at 19.)  Petitioner then
23   listed some of the reasons he was scared:  the victim and his friends
24   were coming towards him making challenging statements; a relative of
25   Petitioner had recently "got jumped" "real bad"; and Petitioner's baby
26   son was in the car.  (*Id.*)

27

28   But Petitioner never as much as hinted to the police that Redd had

a gun.  Petitioner was questioned about this omission at trial, and he was unable to explain it.  He testified only that, until he saw the transcript of the interview, he thought that he had told the police about the gun, and his lawyer elicited testimony that the police never asked Petitioner whether Redd was armed.  (6 RT 1235-36.)  The prosecutor heaped scorn on this explanation during closing argument (7 RT 1332, 1375-76), and nothing in the new evidence renders any more persuasive today Petitioner's shockingly weak explanation of his failure to mention Redd's gun during his police interview.  While the transcript of the interview clearly shows that Petitioner told the police that he was afraid of being "jumped," he never suggested that he was afraid of being shot.  (*Id.* at 19-20.)  It strains credulity that Petitioner could have omitted to mention Redd's gun while enumerating the reasons why Petitioner was scared if, in fact, he had seen a gun on Redd's person.

Petitioner points out that the jury deliberated for almost two days and argues that testimony by Hannah, a "*disinterested observer*," -- that he saw a gun in Redd's waistband and saw Redd's friends remove it after the shooting -- would have tipped the scale and resulted in a verdict of acquittal.  (Objections I at 1, 2, 3, 5.)  This argument is premised on the standard for showing "actual innocence" for purposes of a "gateway" claim under <u>Schlup</u> and does not satisfy the more demanding standard for a "freestanding" actual innocence claim under <u>Herrera</u>.[18]  *See* <u>House</u>, 547 U.S. at 553-55, 126 S. Ct. at 2086-87 (concluding that

---

[18]    A "gateway" actual innocence claim under <u>Schlup</u> permits federal review of a constitutional claim that would otherwise be procedurally barred, but does not by itself provide a basis for federal habeas relief.  <u>Schlup</u>, 513 U.S. at 315, 115 S. Ct. at 861.

the petitioner met the Schlup standard, because if the jury had heard all the conflicting testimony it was "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt," but the evidence did not meet the more demanding Herrera standard).

To meet the "extraordinarily high" Herrera standard, Petitioner must go beyond demonstrating doubts about his guilt and affirmatively prove that he is probably innocent. Carriger, 132 F.3d at 476. As already demonstrated, Petitioner's showing falls far short of this standard. At most, Hannah's declaration strengthens the defense evidence that Redd had a gun and undercuts the prosecution evidence that he did not. It does not, however, affirmatively prove that Petitioner shot Redd in self-defense. Hannah does not declare that Redd pulled out his gun, or that Redd otherwise did something that justified Petitioner firing three or more deadly shots at Redd. More importantly, the fact remains that, although Petitioner told the police that he shot Redd because he was scared, he never said that Redd had a gun -- an omission that is baffling if, in fact, Petitioner saw a gun on Redd's person. Petitioner's new evidence simply does not come close to meeting the "truly persuasive" showing of actual innocence required by Herrera. See Herrera, 506 U.S. at 417, 113 S. Ct. at 869.

Petitioner contends that he is entitled to an evidentiary hearing to develop the factual basis for his claim. (Reply at 9.) "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to

1  federal habeas relief." <u>Landrigan</u>, 550 U.S. at 474, 127 S. Ct. at 1940.

2  Because the Court has concluded that Hannah's assertions in his

3  declaration, even if true, are insufficient to demonstrate Petitioner's

4  actual innocence, an evidentiary hearing to determine Hannah's

5  credibility is unnecessary. *See* <u>Landrigan</u>, 550 U.S. at 474, 127 S. Ct.

6  at 1940.  To the extent Petitioner seeks an evidentiary hearing to

7  present additional evidence in support of his claim, he cannot obtain

8  federal habeas relief based on evidence developed at the evidentiary

9  hearing that was not in the record before the state court when it denied

10  his actual innocence claim.  <u>Pinholster</u>, 131 S. Ct. at 1398.

12    Accordingly, Petitioner's claim does not warrant federal habeas

13  relief even if it is considered and resolved on its merits.

15                            **RECOMMENDATION**

17    For the foregoing reasons, IT IS RECOMMENDED that the District

18  Judge issue an Order:  (1) accepting and adopting this Second Amended

19  Report and Recommendation; and (2) directing that Judgment be entered

20  dismissing the Petition as second or successive pursuant to 28 U.S.C.

21  § 2244(b)(2) or, alternatively, denying the Petition on its merits; and

22  (3) dismissing this action with prejudice.

23  DATED: June 2, 2011

25  _____
26           MARGARET A. NAGLE
     UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.